DIENER, ADMX., APPELLEE, *v.* WHITE CONSOLIDATED
INDUSTRIES, INC., APPELLANT.

(No. 4786—Decided August 6, 1968.)

*Messrs. Pfau, Comstock & Springer,* for appellee.
*Mr. Comus M. Beard, Mr. David C. Haynes* and *Mr. Joseph P. Sontich,* for appellant.

JONES, P. J. In this action, which originated in the Court of Common Pleas of Mahoning County, Muriel G. Diener, administratrix of the estate of Herbert J. Diener, deceased, seeks damages for the alleged wrongful death of her husband. A car-truck collision, which happened on August 2, 1966, at about 2 p. m. on State Route No. 62, approximately two miles west of Salem, Ohio, resulted in the death of the operator of the car, Herbert J. Diener. His passenger, John Snyder, also died as the result of injuries sustained in the accident. The truck was operated by Alex Sedon, an employee of Strong-Carlisle & Hammond, a division of White Consolidated Industries, Inc. The collision gave rise to a civil suit which, upon the issues joined, was tried to a judge and jury, resulting in a

verdict against White Consolidated Industries, Inc., in the sum of $750,000. Judgment was rendered by the court upon the verdict, and a subsequent motion for new trial, filed by White Consolidated Industries, Inc., was overruled. It is from this final order that an appeal on questions of law was perfected to this reviewing court.

State Route No. 62 extends in an east-west direction. Interestingly enough, the center line is also the boundary between two Ohio counties. At the point of the accident, from the center line north is Mahoning County and from the center line south is Columbiana County. Venue is not raised as an issue by the parties. The facts are in dispute; however, the jury obviously determined that the defendant's truck, while being operated by Sedon in an easterly direction on State Route No. 62, crossed the center line without legal excuse and came into contact on the north side of the center line with a car driven by Herbert J. Diener in a westerly direction on the north side of State Route No. 62. This was the evidence presented by the plaintiff and accepted by the jury. Otherwise, of course, the verdict would have been different.

Eleven errors are assigned, of which four have been called to our attention at the outset of defendant's brief as being ''gross error.''

First, we shall consider assignment of error No. 10. There, the question of weight of evidence is brought into issue. As a general rule, good opinion writing calls for the briefest recital of the facts upon which the court determines the issue. In this case, however, we must go into more detail as the facts relate not only to the issue of weight of the evidence but also to other errors assigned.

To be brief, we shall confine ourselves to the questions of negligence and proximate cause. Herbert J. Diener was employed by the Babcock and Wilcox Company, in its New York office, as Assistant Co-ordinator of Capital Appropriations. On August 2, 1966, Herbert Diener had come to the home office of the Tubular Products Division of Babcock and Wilcox in Beaver Falls, Pennsylvania, to familiarize himself with certain expansion projects that

were being carried out at the Beaver Falls and Alliance, Ohio, plants. Diener left with John Snyder, the plant engineer of the Beaver Falls plant, for the Koppel, Pennsylvania, steel plant. The plan was for Diener and Snyder to then continue on to Alliance, Ohio, where they were to meet others. They left in Diener's car, an MG sports car. At the time of the accident, about 2:15 p. m., Mr. Diener was proceeding westerly on route No. 62, about two miles west of Salem, Ohio.

The defendant corporation maintained a division known as the Strong-Carlisle & Hammond Division, which was part of its Mill-Supply Division. Strong-Carlisle & Hammond was a distributor of pipe valves, mill supplies, tools and plumbing and heating equipment. Its Canton manager was Donald Smith. Defendant owned a 1962 GMC truck, used to deliver various supplies and items to its customers and which was regularly driven by Donald Braun.

The front right tire on the truck was completely bald and devoid of any tread at the time of the accident. Ten days to two weeks before the accident the regular driver reported to Mr. Smith that the tire should be replaced. Smith made some inquiries regarding prices of tires but never issued an order to have the tire replaced.

Alex Sedon was a relief driver for the defendant. On the day of the accident he was driving the truck, which weighed 10,000 lbs., with a 2,692 lb. load on it. He had made various deliveries in and around the city of Canton and was on route No. 62, going east towards Salem, Ohio, at the time of the accident.

Sedon testified that as he was proceeding east, it was raining, and the road was wet and he knew of the bald front tire. He stated that he came over a knoll and started down a grade in the vicinity of Barnett's Motel. When he came over the grade he noticed a red Chevrolet (the Tanner car) ahead about two hundred feet. He caught up with the car driven by Mrs. Tanner and, when about thirty-five to fifty feet behind her car, he noticed her brake lights go on. At that point he was going between thirty-five to forty miles per hour and he put on his brakes. Sedon admitted

that, as he endeavored to slow his truck, when he applied his brakes the truck skidded at an angle to the left about ten to fifteen degrees. A second later the collision with the MG driven by Diener, coming in the opposite direction, occurred.

Sedon testified that he did not know exactly what happened; that he did not see the MG before the accident.

A statement taken by the prosecuting attorney of Columbiana County, within a couple of hours of the accident, from Sedon and introduced as defendant's Exhibit 33-A contains the following admissions:

"Q. You didn't. You were always in your line of traffic? A. Well, that's it. I don't know. It happened so fast. Evidently I must have—looked like it hit right in the center of the road.

"Q. Right. So you had to have part of your truck over the center line, didn't you? A. Yes, sir."

While Sedon steadfastly maintained that he was on his own side of the road at the time of the accident, it was clear that Sedon had lost control of his truck, was skidding and had crossed the center line.

Mrs. Gladys Tanner, the operator of the car immediately ahead of the defendant's truck, testified that she lived on route No. 62 on the north side of the road and on the day of the accident she was returning to her home from her employment in Alliance, Ohio. She was driving a red 1960 Chevrolet.

As Mrs. Tanner travelled east she was followed by defendant's truck. Upon coming over the knoll, which was west of the scene of the accident, she put her left turn signals on and gradually brought her car to a stop, waiting for two light colored cars to pass from the opposite direction.

As Mrs. Tanner was stopped waiting to make her left turn, she glanced in her rear view mirror and saw defendant's truck coming up behind her. Something about defendant's truck caused "a fear to come over her," as she put it, and she pulled ahead. She never saw the MG car driven by Diener, although it was obviously approach-

ing. The next thing she heard as she pulled ahead was a crash. She looked in her mirror and saw the truck spinning around in the road behind her and the pipe spilling out.

Following the accident, Mrs. Tanner drove easterly for a short distance, turned around and came back to her home.

Larry Locke, twenty-four years old and single, was driving a 1963 light blue Ford Falcon convertible on the day of the accident. He was on his way to work at TRW in Alliance, Ohio, and was following the Diener car, headed westerly and about five or six car lengths behind Diener.

Locke did not report himself as a witness to the Highway Patrol. He was located through the testimony of Mrs. Vonetta Hutcheson, a paper route carrier for the Salem News, who was about six-tenths of a mile east of the accident and who saw the vehicles immediately after the collision as they were spinning around in the road. At that moment Mrs. Hutcheson saw the blue Falcon convertible drive between the vehicles and pull into Barnett's Motel located on the south side of the highway just west of the accident.

Larry Locke, the one outside eye-witness to the actual collision, lived five miles west of Lisbon. He had recently been discharged from the Army and had started to work at TRW Metals in Alliance. He first noticed the MG as it was leaving Salem, Ohio. Locke gradually caught up with Diener's car until he was about five or six car lengths behind, traveling at a speed of fifty-five miles per hour, He estimated Diener's speed at fifty miles per hour.

Locke stated that as he approached the Tanner driveway he first noticed the truck coming east and that it crossed the center line of the road as though it was making a left turn into a driveway. The crossing occurred only a few feet in front of the MG. Diener did not have sufficient time to put his brake lights on or to swerve. The MG remained in its lane and the entire front end of the truck, including the front tires, were across the center in Diener's car. The vehicles then spread apart, the truck rotating in a counterclockwise position, ending up east of the point of impact and of the Tanner driveway with its front end fac-

ing northwest. The MG bounced off to the north, ending up in the corner formed by the north edge of the road and the westerly edge of the Tanner driveway.

After the impact, Locke drove between the truck and the MG. He then drove into Barnett's restaurant to call the Highway Patrol. He was refused a phone and went outside to use the public telephone. Someone was already using that phone. Because Locke was on a sixty-day probationary period at work, and was afraid of being late, Locke did not remain at the scene as he was afraid he would lose his job.

The Highway Patrol officer, John Van Horn, drove directly to the scene of the accident after receiving the call. After noting the physical characteristics of the scene of the accident, the officer noted under the defect section of his report that the truck had a bald right front tire. Sedon complained to Van Horn that he had had some difficulty with the steering.

After establishing the manner in which the accident happened from the witnesses Locke and Tanner, plaintiff presented the testimony of William Billings, a mechanical engineer specializing in accident reconstruction. Billings was asked, based upon the previous testimony and the photographs, his opinion as to whether the marks described by the Highway Patrol officer were consistant with the accident described by Larry Locke. Billings said they were.

Billings further stated that the bald front tire pivoted on the good left front tire because of the wiping action caused when a bald tire is suddenly braked on wet pavement. This initiated the loss of control of defendant's truck.

Defendant's testimony was confined to two expert witnesses. Dr. Frank D'Isa and Mr. William Ser Vaas. Both of the expert witnesses testified from all of the evidence exhibited to them, which included the MG sports car and numerous pictures of the scene of the accident, that the blue MG sports car, traveling west, came into contact with the right front portion of defendant's truck at or near the

Tanner driveway on the south side of route No. 62 after turning left in front of Mrs. Tanner's car.

Upon review of all the evidence relating to the collision, we are unanimously in accord with the jury, resolving the issues of negligence and proximate cause in favor of the plaintiff and against the defendant.

Another error assigned relates to the alleged excessiveness of the verdict. The pertinent evidence as to this issue is found in Dr. Leonard's testimony, as well as that of Muriel G. Diener and the officers and employees of the deceased's employer, The Babcock and Wilcox Company. Dr. Leonard, of Ohio Wesleyan University, is an economist. He calculated the net loss to the next-of-kin as $605,000. The basis of his computations was covered in direct examination and completely explored upon cross-examination. *The defendant did not present a witness upon this issue.* The jury obviously accepted Dr. Leonard's calculations. In addition to Dr. Leonard's figure, there was testimony by Muriel G. Diener as to Herbert's role as father and head of the house. Also, there was testimony by officers and employees of Babcock and Wilcox as to stock option plans available to Herbert J. Diener. These last matters were not considered by Dr. Leonard, but represent losses in addition to the figure computed by him.

Section 19a, Article I of the Ohio Constitution provides:

"The amount of damages recoverable by civil action in the courts for death caused by the wrongful act, neglect, or default of another, shall not be limited by law."

In determining an award an Ohio jury is likewise governed by Section 2125.02, Revised Code.

"* * * The jury may give such damages as it thinks proportioned to the pecuniary injury resulting from such death to the persons, respectively, for whose benefit the action was brought. * * *."

See *Sutfin* v. *Burton,* 91 Ohio App. 177; *Columbus Ry. P. & L. Co.* v. *Bush,* 5 Ohio Law Abs. 67; *Senn* v. *Lackner,* 91 Ohio App. 83; *State, ex rel. Republic Rubber Division, Lee Tire & Rubber Corp.,* v. *Morse,* 157 Ohio St. 288.

Accordingly, on the issue of excessiveness, we, as a reviewing court, must consider whether the verdict was responsive to the evidence of the loss suffered by the next-of-kin. We subscribe to the sensible rule that we are not to substitute our judgment for that of the jury when there is sufficient evidence before it to resolve an issue.

Certainly, the award is large, but we find sufficient evidence to substantiate it, and though, as jurors, we may have done otherwise, we will not pre-empt this jury determination which is rightfully theirs.

Having found no error in the jury determination of liability, proximate cause and award, we now turn our attention to other issues.

We now consider the matter of the article that appeared in the Youngstown Vindicator on the third day of trial. The article contained the following paragraph:

"Part of the interest in the case stems from the persistent rumor that the defendant offered $250,000 for an out-of-court settlement, but it was refused."

The day following this article, published in the Youngstown Vindicator, defense counsel requested a hearing in chambers relative to the article. The request was granted. A formal motion was made in chambers by defense counsel requesting the court to withdraw a juror and continue the case, as the article was so prejudicial that neither party could be guaranteed a fair trial from that point forward. This motion was overruled, and the jury reassembled. At this point, the trial judge admonished the jurors as follows:

"Now, ladies and gentlemen, before we proceed with the taking of testimony in this case this morning there is a matter of the utmost importance which I must discuss with you, and that is to remind you that all of you have taken a solemn oath to well and truly try this case and base your decision solely and strictly on the evidence which you receive in this courtroom and the law which the court will give to you. You are to banish completely from your minds any idle rumors or speculations which you may have read about or heard concerning any aspect of this case.

This court has utmost confidence in this jury and this court does feel confident that it will abide by its oath and try this case and render a fair judgment as between these parties.''

The law in Ohio is clear on this point. In *Ohio & Western Pennsylvania Dock Co.* v. *Trapnell*, 88 Ohio St. 516, the Supreme Court held that a prejudicial news article must come to the attention of the jurors if a mistrial is to be ordered. Inquiry, at this point, was not put to the jury to determine whether any of them had read the article. As a matter of fact, counsel for defendant specifically did not want the jury polled.

''Mr. Sontich: Are you going to poll the jury, Mr. Haynes?

''Mr. Haynes: No.

''Mr. Sontich: I know it would emphasize it; that is the problem.''

We find no statutory authority for a trial judge to poll a jury during the course of a trial. Further, we question the use of the ''poll'' as it is used in its strictest sense; however, the trial court certainly had within its inherent power the right to put the question to the jurors as to whether they had read the article. A request to make such inquiry of the jury must be initiated by counsel. This was not done, and we cannot say at this point that the jury was aware of the article. To say so would be just as much conjecture on our part as it would have been on the part of the trial judge. It was up to the defendant, the one claiming error, to show that the jury, or any one of them, was aware of the article and, defendant having failed to do so, we find that the trial judge did not abuse his discretion in overruling the motion.

The other facet to this assignment is found in the hearing on the motion for new trial. It appears from the record that defense counsel approached nine jurors who signed the verdict and asked them one question: Did you read the article in the Youngstown Vindicator during the course of the trial? The jurors were subpoenaed to the hearing on the motion for new trial; all appeared but one

who was ill. The trial judge refused to have them put under oath and examined. As a result, defendant proffered the answers into the record of each one answering in the affirmative, *i. e.*: "* * * yes, I read the article."

Just as the trial judge, we are certain that they did, but the trial court acted properly in not permitting the jury to be subjected to questioning, under oath (even though only one question be put to them) after trial in such a matter in the absence of evidence *aliunde*.

As plaintiff's counsel and the court said during the hearing on the motion for new trial:

"Mr. Pfau: * * * This inquiry of the jurors could have been made and would have been made, I am sure, if Mr. Haynes or Mr. Sontich or Mr. Beard had requested it at the time of trial. I am sure the court would have inquired of those jurors whatever question they may have wanted to be asked. Such a request was not made.

"The Court: There was no specific request made that that be done; and if it had been made, I would have given it consideration; I would either have allowed it or not allowed it depending on how I felt it should have been handled. The specific request was not made to the court."

That is exactly what defense counsel could have done. To say that by polling the jury would "emphasize it" is not logical and begs the question. If the jury read it, and it was determined at the time of the motion that in fact one or any of them read the article, the judge, by then over-ruling the motion, might have abused his discretion. We say "might" because the question of whether reading the article is sufficient to sustain such a motion without showing that a juror or jurors were prejudiced by the article is, as defense counsel points out, another point to consider. However, we do not need to pass on that point.

There was a proper way to handle the jury and the article.* Simply stated, request the court to make inquiry

---

*The fact that defense counsel failed to request the court to inquire of the jury, during the course of the trial, whether they or any of them had read the article, but rather called in about ten eminent

of the jury as to whether the article was read. This was not done, so consideration cannot now be given to this assigned error.

This court has read the record concerning the complaints set out in the second assignment of error and finds, without exception, that the statements and conduct of counsel for plaintiff were for the most part prompted by the statements and conduct of counsel for defendant. It just won't do to belabor this court's position on each complaint set out regarding statements and conduct of counsel. We find latitude taken by both sides, but in no respect do we find prejudicial error as the result.

Concerning ourselves now to the eleventh assignment of error:

"The court erred prejudiciously against the defendant-appellant in not sustaining its supplemental motion for a new trial predicated upon newly discovered evidence."

Attached to a supplemental motion for new trial is an affidavit of one Edward Fitzpatrick. Mr. Fitzpatrick claims to have witnessed the accident and answered that it happened as reported by Dr. D'Isa and Mr. Ser Vaas. Counsel for defendant discovered Mr. Fitzpatrick long after trial, but prior to the trial court's ruling on the motion.

New trials on the ground of newly discovered evidence are not favored by the courts. *Taylor* v. *Ross*, 150 Ohio St. 448, 10 A. L. R. 2d 377. This is not necessarily a presumption, but a sensible rule of law.

---

lawyers to decry the article, reminds this court of Abraham Lincoln's words: "If the end brings me out wrong ten angels swearing I was right would make no difference." Certainly the article was beyond the bounds of proper reporting in civil cases. Along with all the eminent members of the Mahoning County Bar who testified, beyond jury hearing, on the motion to withdraw a juror and continue the case, the article shocked the members of this court. The Bar Association ought to work out an agreement with the newspapers, as has been done elsewhere. Otherwise, the lawyers must be content with a reporter's answer when asked, "Mr. Gibson do you honestly feel it has helped anybody, your spreading of the rumor?" Mr. Gibson: "I don't think I have to answer that." As it stands now, he is right, he doesn't have to answer to the Bench or Bar.

From a review of Mr. Fitzpatrick's affidavit it appears clear that his testimony would be cumulative and not of the character that, had it been before the jury, the jury would of necessity have found for the defendant. *Sorochak* v. *Reed*, 31 Ohio App. 401; 40 Ohio Jurisprudence 2d 957, New Trial, Section 52.

The principles laid down by the Ohio Supreme Court governing new trials on the basis of newly discovered evidence are found in *Sheen* v. *Kubiac*, 131 Ohio St. 52, paragraph three of the syllabus:

"To warrant the granting of a motion for a new trial based on the ground of newly discovered evidence, it must be shown that (1) the new evidence must be such as will probably change the result if a new trial is granted, (2) it must have been discovered since the trial, (3) it must be such as could not in the exercise of due diligence have been discovered before the trial, (4) it must be material to the issues, (5) it must not be merely cumulative to former evidence, and (6) it must not merely impeach or contradict the former evidence."

Defendant did not meet these tests, and, accordingly, this assignment of error is not well taken.

Assignment of error number five relates to the court's charge to the jury on the assured-clear-distance statute (Section 4511.21, Revised Code):

"No person shall operate a motor vehicle, trackless trolley, or streetcar in and upon the streets and highways at a speed greater or less than is reasonable or proper, having due regard to the traffic, surface, and width of the street or highway and any other conditions, and no person shall drive any motor vehicle, trackless trolley, or streetcar in and upon any street or highway at a greater speed than will permit him to bring it to a stop within the assured clear distance ahead. * * *."

The issue raised by defendant is that this doctrine has no applicability as the vehicles involved in the collision were traveling in opposite directions.

The instruction given the jury is as follows:

"The first claim of negligence is, that the defendant

was negligent in operating its truck in such a manner and at such a speed that it could not bring it to a stop within the assured clear distance ahead. In this connection I want to refer you to Revised Code Section 4511.21 of the state of Ohio and the pertinent parts which apply here:

" 'No person shall operate a motor vehicle * * * in and upon the streets and highways at a speed greater or less than is reasonable and proper, having due regard to the traffic, surface, and width of the street or highway and any other conditions, and no person shall drive any motor vehicle * * * in and upon any street or highway at a greater speed than will permit him to bring it to a stop within the assured clear distance ahead.'

"As I have just stated to you, no person may operate a motor vehicle at a greater speed than will permit him to bring it to a complete stop within the assured clear distance ahead. That is, the distance between the vehicle he is operating and a visible object in his path of travel. This provision of the law is known as the assured clear distance rule. Now, the assured clear distance constantly changes. It is measured at any moment by the distance between the motorist's vehicle and the rear end of a vehicle ahead in the same lane in which the motorist is proceeding. If a forward vehicle in the same lane of travel stops suddenly, this development does not excuse the operator of the vehicle in the rear from maintaining an assured clear distance sufficient to permit him to completely stop and avoid hitting the forward vehicle. If you find that the defendant did not have such control over his vehicle as to enable it to be stopped within the assured clear distance ahead, then you must find that the defendant was negligent in this respect as a matter of law."

It was the claim of the plaintiff, and specifically set forth in the petition, that the defendant violated the assured-clear-distance rule in following the Tanner vehicle too closely and, also, that the defendant's truck crossed the center line of the highway in violation of Section 4511.25, Revised Code.

The assured-clear-distance-ahead statute, Section

4511.21, Revised Code, is essentially a speed statute—it is prefaced with the heading "Speed Regulations." It was the plaintiff's contention that Alex Sedon, defendant's driver, was operating his truck at a speed that was greater than reasonable or proper under the circumstances, and, had Mrs. Tanner remained in front of her driveway, Sedon would most certainly have collided with her car. In other words, one of the fundamental and basic causes for the accident was Sedon's speed. The violation of the speed statute precipitated the entire accident.

The charge on assured clear distance ahead was essential to a determination of proximate cause. See *Satterthwaite* v. *Morgan*, 141 Ohio St. 447, and *Oechsle* v. *Hart*, 12 Ohio St. 2d 29. It was the Tanner car that was referred to in the instruction by the court; and, thus, we hold that under the circumstances of this case the charge was properly given. The balance of the issues, though not commented upon, have all been reviewed in depth, and we find them not to be well taken.

Accordingly, the judgment is affirmed.

*Judgment affirmed.*

O'Neill and Duffy, JJ., concur.

Duffy, J., of the Tenth Appellate District, sitting by designation in the Seventh Appellate District.